1 | Mark Punzalan (CA SBN 247599)
2 | mpunzalan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
3 | 100 Bush Street, Suite 1450
San Francisco, CA 94104
4 | Telephone: (415) 398-8700
Facsimile: (415) 398-8704
5 |
6 | Richard M. Volin
**FINKELSTEIN THOMPSON LLP**
7 | The Duvall Foundry
1050 30th Street, N.W.
8 | Washington, DC 20007
Telephone: (202) 337-8000
9 | Facsimile: (202) 337-8090
10 |
*Attorneys for Plaintiff*
11 |



12 | **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
13 |

14 | TOBY AGUILAR, derivatively on behalf of
15 | OCLARO, INC.,

*EDL*

**CV 11 3668**

16 | Plaintiff,  )  Civil Action No. _____
17 | v.  )  VERIFIED SHAREHOLDER
  )  DERIVATIVE COMPLAINT FOR
  )  BREACH OF FIDUCIARY DUTY
18 | BERNARD COUILLAUD, GREG  )  AND VIOLATION OF THE
19 | DOUGHERTY, EDWARD COLLINS, LORI  )  FEDERAL SECURITIES LAWS
  HOLLAND, GIOVANNI BARBAROSSA,  )
20 | ALAIN COUDER, JOEL A. SMITH III,  )  **DEMAND FOR JURY TRIAL**
  JERRY TURIN, and JAMES HAYNES,  )
21 |  )
  )
22 |  )
23 | Defendants.  )
  and  )
24 |  )
  OCLARO, INC.,  )
25 |  )
  Nominal Defendant  )
26 |

27 |

28 |

- 1 -

SHAREHOLDER DERIVATIVE COMPLAINT

# INTRODUCTION

1.      Plaintiff Toby Aguilar ("Plaintiff"), by and through his undersigned counsel, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Oclaro, Incorporated ("Oclaro" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' breaches of fiduciary duties and violation of Section 10(b) and 21D of the Securities and Exchange Act of 1934 (the "Exchange Act") from May 6, 2010 continuing to the present (the "Relevant Period"). On or about May 19, 2011, a shareholder securities class action was filed against the Company and certain of its officers and/or directors for violations of the Exchange Act. The Class Action asserts claims on behalf of all those who purchased or otherwise acquired the securities of Oclaro from May 6, 2010 and October 27, 2010, inclusive (the "Class Period").

2.      Oclaro is a leading provider of high-performance core optical network components, modules and subsystems to global telecommunications equipment manufacturers. Oclaro claims to leverage its proprietary core technologies and vertically integrated product development to provide to its customers cost-effective and innovative optical solutions in metro and long-haul network applications. Oclaro also addresses new and emerging optical product opportunities in selective non-telecom markets, including materials processing, consumer medical, industrial, printing and biotechnology which Oclaro refers to as its "Advanced Photonics Solutions Business."

3.      The Class Action alleges that Defendants caused the Company to issue a series of materially false and misleading statements, discussed in detail below, relating to the Company's then current business and financial condition, including projections for its first quarter 2011 and fiscal 2011 revenues, earnings, and gross margins.

- 2 -

4.      On May 6, 2010, Oclaro filed a Prospectus Supplement on Form 424(b)(5) ("2010 Supplement") with the Securities and Exchange Commission ("SEC") for a secondary offering of 6.9 million shares of Oclaro common stock at $12.00 per share (the "Offering"). The Offering was completed on May 12, 2010, netting Oclaro approximately $77.2 million.

5.      The Class Action alleges that the 2010 Supplement falsely claimed that customer demand for the Company's products was increasing and that there was high customer demand and failed to disclose that Oclaro was experiencing weakening demand for its products, which would result in lower revenue, sales, and gross margin shortfalls, and instead touted the strong demand.

6.      The Class Action also alleges that the 2010 Supplement further failed to disclose that:

   (i)     Demand for Oclaro's products, which generally have a sales cycles of one year, was flat or declining well before announcing earning in the morning of October 28, 2010;

   (ii)    Oclaro had no reasonable basis for its forecast of accelerated gross margin growth or that orders for Oclaro products would cover forecasted financial results; and

   (iii)   Oclaro's capacity to meet forecasted revenues, earnings, and margin growth was severely compromised.

7.      The Class Action also alleges that as a result of Defendant's materially false and misleading statements and failure to disclose material information, Oclaro's common stock traded at artificially inflated prices during the Relevant Period, trading as high as $17.07 per share on October, 17, 2010.

8.      On October 28, 2010, the truth was finally revealed when the Company announced its first quarter 2011 results, which disclosed an enormous earnings miss and sequential decline in revenues and gross margin. Oclaro reported first quarter 2011 earnings results of $0.01 per share

- 3 -

1    compared to analyst estimates of $0.22 per share, to go along with its declines in revenues and gross

2    margins.   As a result of these shocking results which were in stark contrast to the Company's

3    previous guidance, the price of Oclaro's common stock fell 37%, closing at $8.60 on October 28,

4    2011.

5        9.    The stock price has not recovered and as a result, Oclaro has been damaged.  The

6    Class Action alleges that the Company and its officers and/or directors participated in the wrongful

7
     conduct alleged herein, and are equally liable for violation of Section 10(b) of the Exchange Act
8
     and Rule 10b-5.  Assuming the Company is liable, the Individual Defendants caused the Company
9
10   to violate Section 10(b) of the Exchange Act, and to incur liability for damages.

11       10.   Plaintiff brings this derivative action to recover damages for the benefit of Oclaro

12   from Oclaro's officers and directors and to require Oclaro to adopt corporate governance reforms

13   and internal procedures to protect Oclaro from ever again being subjected to the events described in

14   this Complaint.

15
                          **JURISDICTION AND VENUE**
16

17       11.   This Court has jurisdiction pursuant to 28 U.S.C. 1331 (federal question jurisdiction)

18   insofar as this action arises under Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), pursuant to

19   which there is a private right of action for contribution; and Section 21D of the Private Securities

20   Litigation Reform Act, 15 U.S.C. 78u-4, which governs the application of any private right of

21   action for contribution asserted pursuant to the Exchange Act.  Prior to Congress having enacted an

22   express provision for contribution under Section 21D of the Exchange Act, the United States

23   Supreme Court recognized that a federal cause of action exists for contribution pursuant to Section

24   10(b) of the Exchange Act and Rule 10b-5.  *See Musick, Peeler & Garrett v. Employers Insurance*

25
     *of Wausau*, 508 U.S. 286 (1993).   Thus, pursuant to federal statutory law and Supreme Court
26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1   authority. this Court has original federal question jurisdiction over the Federal contribution claim

2   alleged herein.

3        12.    This Court has supplemental jurisdiction over the state law claims asserted herein

4   pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court

5   of the United States which it would not otherwise have.

6        13.    Venue is proper in this District because a substantial portion of the acts and practices

7   complained of herein, including the misrepresentations alleged herein, occurred in substantial part

8   in this District, and Oclaro has executive offices located in this District at 2560 Junction Avenue,

9
10  San Jose, California 95134.

11                                          **PARTIES**

12       14.    Plaintiff Toby Aguilar is a current shareholder of Oclaro and has held Oclaro stock

13  during the Relevant Period.

14
15       15.    Nominal defendant Oclaro is incorporated in the State of Delaware.  It maintains its

16  principal executive offices at 2560 Junction Avenue  San Jose, California 95134

17       16.    Defendant Alain Couder ("Couder") was, at all relevant times, Chief Executive

18  Officer, President and Director of Oclaro.

19       17.    Defendant Jerry Turin ("Turin") was, at all relevant times, Chief Financial Officer of

20  Oclaro.

21       18.    Defendant Bernard Couillaud ("Couillaud") was, at all relevant times, Chairman of

22
23  the Board of Directors of Oclaro.

24       19.    Defendant Giovanni Barbarossa ("Barbarossa") was, at all relevant times, a member

25  of the Board of Directors of Oclaro.

26       20.    Defendant Edward Collins ("Collins") was, at all relevant times, a member of the

27  Board of Directors of Oclaro, and a member of the Audit Committee.

28

SHAREHOLDER DERIVATIVE COMPLAINT

21.    Defendant Greg Dougherty ("Dougherty") was, at all relevant times, a member of the Board of the Directors of Oclaro, and a member of the Audit Committee. .

22.    Defendant Lori Holland ("Holland") was, at all relevant times, a member of the Board of Directors of Oclaro, and Chairman of the Audit Committee..

23.    Defendant Joel A. Smith III ("Smith") was, at all relevant times, a member of the Board of Directors of Oclaro.

24.    Defendant James Haynes ("Haynes") was, at all relevant times, the Chief Operating Officer of Oclaro.

25.    Defendants Couder, Turin, Haynes, Couillaud, Barbarossa, Collins, Dougherty, Holland, and Smith are collectively the "Individual Defendants", and together with Oclaro, the "Defendants."  Defendants Collins, Dougherty, and Holland are collectively the "Audit Committee Defendants."

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

26.    The allegations contained in the section summarize the essential allegations of the Class Action Complaint.

27.    Oclaro is a leading provider of high-performance core optical network components, modules and subsystems to global telecommunications equipment manufacturers.  Starting on May 6, 2010, with the filing of its Prospectus Supplement on Form 424(b)(5) through which the Company would eventually sell 6.9 million shares of common stock for net proceeds of more than $77 million, the Company issued a series of materially false and misleading statements relating to the its current business and financial condition, including projections for its first quarter 2011 and fiscal 2011 revenues, earnings, and gross margins.

## FALSE AND MISLEADING STATEMENTS

SHAREHOLDER DERIVATIVE COMPLAINT

28.     Oclaro's 2010 Supplement was riddled with falsehoods, claiming customer demand for its products to have been increasing, when in fact Oclaro was experiencing weakening demand for its products, which would result in lower revenue, sales, and gross margin shortfalls.

29.     The 2010 Supplement, instead of revealing the weakening demand, touted strong demand stating:

> We are currently seeing a return of customer demand which had decreased as a result of adverse economic conditions in the preceding 18 to 24 months. Our ability to respond to this demand will, among other things, be a function of our ability to attract, train and retain skilled labor in China.
>
> *        *        *
>
> As customer demand has recently increased in our markets, and in adjacent markets, lead times for the purchase of certain materials and equipment from suppliers required to meet this demand have increased and in some cases have limited our ability to rapidly respond to increased demand....

30.     On May 12, 2010, Morgan Keegan Equity Research issued a report on the Offering, describing it as opportunistic, with Oclaro using its results and strong forecasts to raise cash.  The report states, in part, as follows:

### OCLRD: Padding the Coffers

> Oclaro today announced closing of its secondary offering of 6.9 mm shares (6.0 mm plus 0.9 mm over-allotment) at $12.00 per share, netting the company $77.2 mm after expenses.
>
> We think Oclaro took advantage of favorable market conditions and sentiment around its strong results and forecasts to opportunistically raise cash, with the top-line growth (contribution margin) complementing merger synergies . . . and revenue from acquired Xtellus providing another tailwind.

31.     On July 29, 2010, Oclaro announced its fourth quarter, fiscal year 2010 results, beating analyst earnings expectations and reporting accelerated and strengthening growth forecasts for revenues, earnings and gross margins for the Company's first quarter 2011 and fiscal year 2011.

- 7 -

32.    The press release, entitled "Oclaro Announced Record Profitability in Fourth Quarter Fiscal 2010; 44% Fourth Quarter FY 2010 over Fourth Quarter FY 2009 Pro-Forma Revenue Growth," states as follows:

> SAN JOSE, Calif., July 29, 2010 /PRNewswire via COMTEX News Network/ -- Oclaro, Inc. (Nasdaq: OCLR), a provider of optical components, modules and subsystems, today announced the financial results for its fourth quarter and fiscal year 2010, which ended July 3, 2010.
>
> "We are proud to have been profitable on a non-GAAP operating income basis for our first year as Oclaro, our adjusted EBITDA has increased each quarter and our operating margins continue to trend upwards," said Alain Couder, president and CEO of Oclaro. "Our technology differentiation and product breadth are creating new opportunities for Oclaro; and so we believe our growth will continue through 2010 and that calendar 2011 is shaping up to be a strong growth year."
>
> Highlights for Fourth Quarter Fiscal 2010:
>
> •    GAAP revenues were $112.7 million for the fourth quarter of fiscal 2010, compared to $101.2 million in the third quarter of fiscal 2010...
>
> •    GAAP gross margins were 30% for the fourth quarter of fiscal 2010, compared to 28% in the third quarter of fiscal 2010.
>
> •    GAAP operating income was $8.6 million for the fourth quarter of fiscal 2010, compared to $33,000 in the third quarter of fiscal 2010.
>
> •    Adjusted EBITDA was $12.3 million for the fourth quarter of fiscal 2010, compared to $5.8 million in the third quarter of fiscal 2010, an increase of over 100%
>
> •    GAAP net income for the fourth quarter of fiscal 2010 was $10.6 million, compared $0.2 million in the third quarter of fiscal 2010.
>
> •    Cash, cash equivalents, restricted cash and short-term investments were $111.6 million as of July 3, 2010. This includes $77.1 million received in the Company's May follow-on offering of common stock.

- 8 -

• The Company acquired Mintera Corporation in a deal announced and closed July 21, 2010. Oclaro has a target model for the high speed transmission business of Mintera of gross margins of 40% to 45% and non-GAAP operating margins of 20% to 25%.

33.    Oclaro's July 29, 2010 press release reported first quarter 2011 expectations, projecting revenues to increase to $126 million and gross margins to be in the range of 31% to 33%.

34.    On July 29, 2010, Oclaro held a conference call with analysts and investors to discuss the Company's 2010 fourth quarter results and its first quarter 2011 bullish forecast. The transcript, in part, states as follows:

> [Turin:] We've intentionally increased our material stocks and are strategically staging more of this stock to be positioned to execute on the strong demand we continue to see out there.

> [Couder:] We are quite bullish and we believe our (inaudible) [growth rate] should be in the 30% to 40% range. Many of our existing products are taking market share.

> *        *        *

> [Turin:] We've previously indicated that we expect to achieve 35% gross margins by the June quarter of this coming fiscal year and with solid revenue demand, we could achieve the target as early as this December....

> We have previously defined our non-GAAP operating income target margin to be 10% at 35% gross margins. Today we are increasing that target operating model to a range of 12% to 15% non-GAAP operating income at 35% gross margins.

35.    Defendants signaled to investors that their bullish forecast was not a projection or wishful thinking, but was already supported by 85%-90% order coverage for the first quarter 2011. Furthermore Defendants emphasized that Oclaro expected to meet any inventory needs required by the strong demand for Oclaro's products for both the first and second quarter 2011. The transcript states that:

> [Turin:] From an orders point of view . . . now we're between 85% and 90% covered for the September quarter. So that gives you a gauge

- 9 -

on how we... feel pretty good and that we're in a pretty strong position from an order point of view.

\*    \*    \*

[W]e feel that strong demand continues through the second half of this calendar year.

\*    \*    \*

[W]e've not seen any examples of double ordering. And like I answered a second ago we think that the order pattern is quite rational if I had seen a similar book-to-bill as we saw in March, then you might worry about the system getting overheated or inventories building up or double orders. But where we're at now, we don't think there's any of that.

36.    On July 30, 2010, BWS Financial issued a report on the Oclaro's performance with emphasis on the advance attainment of 35% gross margin by 2Q11.  The report states that:

**Demand Pacing ahead of Supply**

•    Oclaro (OCLR) is hitting operational efficiency markers faster than expected, leading to achieving operating goals sooner than expected . . . . [T]he Company indicated gross margins of 35 percent would be attained by the December quarter instead of the March quarter.

\*    \*    \*

•    OCLR issued better than expected guidance for fiscal first quarter, which leads us to raise our numbers. The new operating model goals would allow for a higher EPS number than we had originally forecast. We are now projecting OCLR to earn $1.15 a share in fiscal 2011 and $1.60 a share in fiscal 2012.

37.    On July 30, 2010, Miller Tabak & Co. issued a report on Oclaro's performance emphasizing the strong demand and growth forecasts reported by Defendants to market analysts.

38.    On September 1, 2010, the Company filed its Form 10-K for the fiscal year 2010 (the "2010 Form 10-K").  The 10-K was signed by Defendants Couder, Turin, Couillaud, Barbarossa, Collins, Dougherty, Holland, and Smith, and contained false and misleading statements relating to the Company's internal controls and disclosure procedures.  The 10-K stated in relevant part:

- 10 -

SHAREHOLDER DERIVATIVE COMPLAINT

**Item 9A.    Controls and Procedures**

**(a)    Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of July 3, 2010. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, or the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by the company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its Chief Executive Officer and Chief Financial Officer, as the principal executive and financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of July 3, 2010, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

Management's report on our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) is included immediately below and is incorporated herein by reference

**(b)    Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over our financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements, fraud or the results of fraud. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of July 3, 2010. In making its assessment of internal control over financial reporting, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control — Integrated Framework.

Based on our assessment, management concluded that, as of July 3, 2010, our internal control over financial reporting is effective based on these criteria.

Our independent registered public accounting firm has issued an attestation report on the effectiveness of our internal control over financial reporting. This report appears under Item 8 of this Form 10-K.

Management excluded Xtellus Inc. and its subsidiaries from its assessment of internal control over financial reporting as of July 3, 2010, because this entity was acquired by the Company in a business combination during the fiscal year ended July 3, 2010.

**(c)    Changes in Internal Control over Financial Reporting**

There were no changes in our internal controls over financial reporting during the most recent fiscal quarter ended July 3, 2010 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

39.    On September 9, 2010, the Company filed its Proxy Statement on Schedule 14(a) with the SEC (the "Proxy"). The Proxy, which was signed by the Individual Defendants, incorporated by reference the Company's false and misleading 2010 Form 10-K.

40.    Between September 19 and September 23, 2010, executives from Oclaro attended the European Conference on Optical Communications in Torina, Italy. The Company's management again reiterated Oclaro's bright financial prospects and high demand for Oclaro's products. On September 21, 2010, Auriga reported as follows:

**ECOC Review: Bullishness in Optical Sector Abounds**

The European conference on Optical Communications (ECOC) is under way in Torino, Italy, this week. We note continuing bullishness from Oclaro (OCLR, Buy) and Finisar (FNSR, Hold) at the show. We use this note to provide an important technology update. Although we continue to prefer OCLR to FNSR, both sets of managements

- 12 -

continue to express strength in their near-term business as well as their longer-term outlook.

## THE TRUTH EMERGES

41.    On October 28, 2010, before the market opened, Oclaro issued a press release announcing its first quarter 2011, for the quarter ending October 2, 2010.

42.    The results were shocking, differing drastically from the Company's repeated bullish statements.

43.    Instead of projected revenues of $126 million, the company posted revenues of only $121 million – a 4% decline.

44.    As opposed to earnings per share of $0.22 as expected based on Defendants misleading statements, the Company reported earnings of only $0.01 per share, with gross margins of 29% as opposed to the analyst consensus of 33%, a sequential decline from the fourth quarter 2010.

45.    On top of dramatically missing its forecasted earnings, the Company also announced that it would sharply reduce future forecasted earnings and gross margin growth for the second quarter 2011, which the Company had previously claimed would eclipse previous expectations. The Company attributed this change in their financial position on purportedly sudden and unexpected order cancellations and customer inventory corrections occurring in the second half of September:

> "We are proud of our 43% year on year growth for the quarter. However, we experienced a slowdown in the rate of revenue growth in late September. Accordingly, our guidance for the December quarter is cautious," said Alain Couder....
>
> Revenues were $121.3 million for the first quarter of fiscal 2011, compared to $112.7 million in the fourth quarter of fiscal 2010... GAAP gross margin was 29% for the first quarter of fiscal 2011, compared to 30% in the fourth quarter of fiscal 2010... GAAP operating income was $5.0 million for the first quarter of fiscal 2011, compared to $8.6 million in the fourth quarter of fiscal 2010... Adjusted EBITDA was $10.9 million for the first quarter of fiscal 2011, compared to $12.3 million in the fourth quarter of fiscal 2010.

GAAP net income for the first quarter of fiscal 2011 was $0.4 million, compared to $10.6 million in the fourth quarter of fiscal 2010...

Second Quarter Fiscal 2011 Outlook.

The results of Oclaro, Inc. for the second quarter of fiscal 2011, which ends January 1, 2011, are expected to be:

Revenues in the range of $116 million to $124 million. Non-GAAP gross margin in the range of 27% to 31%. Adjusted EBTIDA in the range of $6 million to $11 million.

46.    Later that day the Company held a conference call to discuss the disastrous first quarter results. During the conference call Defendants Couder and Turin tried to somehow justify why the Company's actual results were so divorced from their previous public statements,:

[Couder:] So, we [found this out] [cancellations and push outs] not with the announcement, but, in fact, in mid-September when our customer[s] told us they needed to perform inventory correction. They either push out some of the order[s] to the next quarter or cancel the order altogether.

... We are giving cautious guidance for the December quarter, basically flat from the September quarter.

                    *        *        *

[Turin:] For the December quarter, we do not see our product mix changing for the positive at this time. For example, our expected revenue decline in APS for the December quarter is largely due to an inventory correction and particularly high-margin consumer market. We expect relatively flat revenues overall in December. So we do not expect to drive any corresponding gross margin expansion from shipping more revenues out of our internal manufacturing facility.

47.    An analyst from Miller Tabak challenged the Defendants on the apparent contradiction of the Company's earlier statements indicating that the Company already had 85% order coverage for the first quarter:

[Alex Henderson - Miller Tabak:]... [S]o help me understand this inventory correction commentary then. It sounds like you had... said that you'd expected that you were pretty well covered for the full quarter by the middle of August. And yet you saw enough falloff to result in you coming in at the bottom of your band of guidance for

- 14 -

SHAREHOLDER DERIVATIVE COMPLAINT

1

2

> the....September quarter. And yet you're saying your book-to-bill was above one. And you're saying that order rates are normal in the current month. It seems like there's a contradiction in that.

3    48.    On October 28, 2010, Oplink Inc. ("Oplink"), one of the Company's main

4    competitors, announced its first quarter results, beating analyst estimates.  On a conference call

5    discussion of Oplink's financial results, Oplink CEO, Joe Lui was asked about Oclaro's earlier

6    discussion about inventory buildup and order cancellations. Lui's response: "We have not seen that

7    order canceling and pushout."  Lui was also asked about softness in customer demand and whether

8    it was sudden or abrupt. Lui replied that changes were "gradual...[s]oftness doesn't come

9    overnight."

10

11    49.    Lui's statement directly challenges Defendants Couder and Turin's supposed

12    justification for Oclaro's shocking first quarter results.

13    50.    Simply, Defendants issued or caused to be issued false and misleading statements

14    throughout the Relevant period which failed to disclose that (1) demand for Oclaro's products,

15    which have sales cycles of one year, was flat or declining well before October 28, 2010; (2) the

16    Company did not have a reasonable basis for its forecast of accelerated gross margin growth or that

17    orders for Oclaro products would cover forecasted financial results; and (3) Oclaro's capacity to

18    meet forecasted revenues, earnings, and margin growth was severely compromised.

19

20

21

22

23

24

25

26

27

28

- 15 -

SHAREHOLDER DERIVATIVE COMPLAINT

## THE DEFENDANTS FIDUCIARY DUTIES

51.     By reason of their positions as officers, directors, and fiduciaries of Oclaro and because of their ability to control its affairs, the Individual Defendants own the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to manage the company in an equitable fashion, in the best interests of the Company and its shareholders, and not for their own benefit.   Each Individual Defendant owes Oclaro and its shareholders the fiduciary duty to exercise good faith and diligence in managing the affairs of the Company.   The Individual Defendants, as officers and directors of the Company, owed it a duty to promptly disseminate accurate and truthful material information regarding the Company.

52.     Defendants Collins, Doughtery, and Holland, as members of the Audit Committee ("Audit Committee Defendants") owed Oclaro additional specific duties under the Audit Committee's Charter.   The Charter required them to review and approve quarterly and annual financial statements, earnings press releases, and to make sure that the Company implemented and maintained adequate internal procedures and controls over its financial reporting.

53.     The Individual Defendants were required to exercise reasonable controls over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Oclaro were required to, among other things: (a) refrain from acting upon material inside corporate information to benefit themselves; (b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statement to the investing public; (c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (d) properly and accurately guide investors and analysis as to the true financial condition of the Company at any given time, including

SHAREHOLDER DERIVATIVE COMPLAINT

making accurate statements about the Company's financial results; (e) reform informed as to how Oclaro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; (f) ensure that Oclaro was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

54.    Defendants, because of their positions of control and authority as directors and/or officers of Oclaro, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.    Because of their advisory, executive, managerial, and directorial positions with Oclaro, each of the Defendants had knowledge of material non-public information regarding the Company.

55.    To discharge their duties, the officers and directors of Oclaro were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Oclaro were required to, among other things:

      a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

      c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

56.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly and/or indirectly, exercise control over the wrongful acts in the Complaint.

- 17 -

57.    The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and or failing to disclose that (a) demand for Oclaro's products was flat or declining before October 28, 2010; (b) the Individual Defendants did not have a reasonable basis for their forecast of accelerated gross margin or that orders for Oclaro products would cover forecasted financial results; (c) Oclaro's capacity to meet forecasted revenues, earnings, and margin growth was severely compromised.

## DAMAGES TO OCLARO

58.    Because of the Individual Defendant's wrongdoing, Oclaro disseminated false and misleading information to shareholders subjecting the Company to the Class Action.  The misleading statements have resulted in Oclaro facing federal securities lawsuits, and caused a massive reduction in its market capitalization:  from $845.1 million on October 14, 2010 to around $400 million currently.

59.    As a direct and proximate result of the Individual Defendants' conduct and if the Company is deemed to have violated the federal securities laws, the Individual Defendants are liable to the Company for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act and Rule 10b-5 promulgated under Section 10(b).  Oclaro has also incurred substantial costs including, but not limited to, the costs incurred from compensation and benefits paid to the Individual Defendants based on artificially inflated stock prices, costs incurred as a result of lost confidence by shareholders and customers in Oclaro's credibility, damaging its goodwill.  Oclaro will furthermore be impaired in its effort to raise capital, and will have a higher discount rate applied to it as a result of this loss of confidence in the true of its finances and the risks facing its capital providers.  Both its cost of equity and credit will remain higher because of the Individual Defendants' conduct.

- 18 -

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

60. Plaintiff brings this action derivatively on behalf of and for the benefit of Oclaro to redress injuries suffered and yet to be suffered, by it as a direct and proximate result of the breaches of fiduciary duties alleged herein. The Company is a nominal defendant named solely in a derivative capacity.

61. Plaintiff held shares of Oclaro during the Relevant Period and continues to hold shares today. Thus, Plaintiff was an Oclaro shareholder during the wrongdoing complained of herein.

62. Plaintiff will fairly and adequately represent the interests of the Company, and has retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

63. The wrongful acts complained of herein subject, and will persist in subjecting, Oclaro to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

64. The Board of Oclaro currently consists of seven directors, all named defendants in this action.

65. The Defendants owed a duty to Oclaro and its shareholders to be reasonably informed about its business and operations of the Company. The Defendant completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

66. Plaintiff did not make a demand on the Oclaro board prior to instituting this action because the wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of their fiduciary duties, including the duty to exercise oversight, due care, and diligence.

SHAREHOLDER DERIVATIVE COMPLAINT

67.    The misstatements and omissions and failure to institute procedures required by law are not the product of a valid or good faith exercise of business judgment.

68.    Demand is excused because the Board either knew about or should have inquired into the Company's manipulative actions relating to the issuing of false and/or materially misleading information to the public by means of SEC filings and press releases.

69.    The Defendants ignored the evidence of significant inaccuracies of their transactions and balances recorded on the Company's financial statements and records and therefore face a substantial likelihood of liability for breaches of fiduciary duty due to their willful failures to institute a system of adequate controls.

70.    Defendant Couder additionally faces a substantial likelihood of liability as a result of his misconduct as a named defendant in a federal class action under Section 10b of the 1934 Securities and Exchange Act.  As such, pursuit of the claims in this derivative action by Defendant Couder would expose his misconduct and impair his defense in the pending federal securities action.

71.    The Audit Committee Defendants face a substantial likelihood of liability from their breaches of their additional duties under the Audit Committee Charter for failing to abide by their responsibilities to make sure that the Company's reporting was accurate.   The three Audit Committee Defendants when combined with Defendant Couder, constitute a majority of the Board, thereby making demand futile.

72.    The Individual Defendants cannot exercise independent objective judgment in deciding whether to bring this action because they are personally interested in the outcome of this lawsuit as it is their actions which have subjected Oclaro to liability.   Here the Individual Defendants signed the Company filing containing the false and misleading statements underlying the federal securities class action and therefore are interested in the outcome of this litigation.

SHAREHOLDER DERIVATIVE COMPLAINT

73.    Demand is excused because the Individual Defendants are unable to sue themselves to remedy the wrongs complained of herein as doing so would expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage, available to the Oclaro defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.

74.    Demand is excused because Defendants are unable to sue themselves due to the "insured versus insured" exclusion, which upon information and belief is contained within their directors' and officers' liability insurance.  The Defendants are most likely protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance. Due to language in certain directors' and officers' liability insurance policies most likely, the policy covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Oclaro against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all, then the current directors will not cause Oclaro to sue them, since they will face a large uninsured liability.

## COUNT I

**Against the Individual Defendants for Contribution
Pursuant to Sections 10(b) and 21D of the Exchange Act, and Rule 10b-5 Promulgated Under
Section 10(b)**

75.    Plaintiff repeats and realleges each and every allegation set forth herein.

- 21 -

SHAREHOLDER DERIVATIVE COMPLAINT

76.    The Individual Defendants had a duty not to defraud the investing public by the dissemination of materially false and/or misleading financial information or press releases.

77.    They also had a duty of full disclosure as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public.  Further they had a duty to disseminate promptly truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the Securities and Exchange Commission (the "SEC"), as embodied in, *inter alia*, SEC Regulation S-X (17 C.F.R. § 210.01, et. Seq.) and S-K (17 C.F.R. § 229.10 et seq.).  This duty includes disclosing accurate and truthful information regarding the Company's business, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

78.    The Class Action alleges that the Individual Defendants caused the Company to issue materially false and/or misleading statements, as alleged above, and that as a result, the Company and these defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

79.    The Class Action alleges that the Individual Defendants knew and/or recklessly disregarded that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or document as primary violators of the federal securities laws.  The Individual Defendants, by virtue of their positions in the Company as senior managers and/or directors, had knowledge of the details of Oclaro's internal affairs and had control over the content of the statements, and were active and culpable participants in the scheme alleged herein.

80.    The ongoing scheme the Class Action Complaint alleges could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

- 22 -

SHAREHOLDER DERIVATIVE COMPLAINT

81.    The Class Action Complaint alleges that the Individual Defendants caused Oclaro to carry out a plan, scheme, conspiracy and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, as alleged herein; (ii) artificially inflate and maintain the market price of Oclaro securities; and (iii) caused members of the Class to purchase Oclaro stock at artificially inflated prices.  As alleged in the Class Action, these defendants: (a) engaged in a scheme under which they knowingly or recklessly engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit upon Plaintiff and other Class members; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (c) employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

82.    As alleged in the Class Action, as a result of the dissemination of the materially false and/or misleading information and failure to disclose material facts, as set forth above, the market prices of Oclaro's securities during the Class Period was artificially inflated.  Unaware of this artificial information and adverse facts concerning Oclaro's business and financial condition, and relying on the price of the securities, the integrity of the market for the securities, and/or the materially false and/or misleading statements the Individual Defendants made, Class members acquired Oclaro securities during the Class Period at artificially high prices and were damaged.

83.    The Class Action alleges that the Company and the Individual Defendants participated in the wrongful conduct alleged herein, and is equally liable for violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Assuming that the company is liable, the Individual Defendants caused the Company to violate Section 10(b) of the Exchange Act, and to incur liability for damages.

84.    If the Company is deemed to have violated the federal securities laws, and incurs damages as a result, the Individual Defendants are liable to the Company for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act and Rule 10b-5 promulgated under Section 10(b).

## COUNT II

### Against All Defendants for Breach Of Fiduciary Duty

85.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's public filings were complete and accurate, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

87.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Oclaro, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing Oclaro to misrepresent material facts regarding its financial position and business prospects.

88.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Oclaro in a manner consistent with the duties imposed upon them by law.    By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Oclaro's affairs and in the use and preservation of Oclaro's assets.

89.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Oclaro to engage in the actions complained of herein which they knew had an

- 24 -

unreasonable risk of damage to Oclaro, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged Oclaro.

90.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Oclaro shareholders materially misleading and inaccurate information through, inter alia, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

91.    73.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein. Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

92.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Oclaro has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

93.    As a result of misconduct alleged herein, Defendants are liable to the Company.

## COUNT III

### Against All Defendants for Corporate Waste

94.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.    Defendants owed and owe Oclaro fiduciary obligations. By reason of their fiduciary relationships, Defendants specifically owed and owe Oclaro the highest obligation of good faith, fair dealing, loyalty and due care.

96.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

- 25 -

97.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Oclaro has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

98.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Oclaro to incur (and Oclaro may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

99.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

100.    Plaintiff, on behalf of Oclaro, has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Unjust Enrichment

101.    A Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Oclaro.

103.    Plaintiff, as a shareholder and representative of Oclaro, seeks restitution from Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

104.    Plaintiff, on behalf of Oclaro, has no adequate remedy at law.

### COUNT V
### Violation of Section 20(a) of the Exchange Act
### (Against All Defendants)

105.    Plaintiff repeats and realleges each and every allegation set forth herein.

- 26 -

106.   The Individual Defendants acted as controlling persons of Oclaro within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Oclaro, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in documents filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

107.   Each of the Individual Defendants was provided with or had unlimited access to Company filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

108.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

109.   As a direct and proximate result of defendants' conduct, the Company was, and continues to be harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff demands judgment in favor of Oclaro against all defendants as follows:

A.   Declaring that plaintiff may maintain this action on behalf of Oclaro and that plaintiff is an adequate representative of Oclaro;

B.   Against the Individual Defendants for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act, and Rule 10b-5 promulgated under Section 10(b);

- 27 -

C.    Declaring that defendants have violated, among other things, their fiduciary duty of loyalty (and good faith and candor) owed to Oclaro and its shareholders;

D.    Directing Oclaro to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Oclaro and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

> (a)    a proposal to create corporate governance guidelines to strengthen the supervision of overseas investments and operations, including guidelines to ensure that all available monitoring and governance opportunities are pursued by the Board;
>
> (b)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
>
> (c)    a provision to permit the shareholders of Oclaro to nominate at least three candidates for election to the Board;
>
> (d)    a proposal to ensure the accuracy of the qualifications of Oclaro's directors, executives and other employees;
>
> (e)    a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and
>
> (f)    appropriately test and then strengthen the internal audit and control functions.

E.    Determining and awarding to Oclaro the damages sustained by it as a result of the

- 28 -

SHAREHOLDER DERIVATIVE COMPLAINT

1   violations set forth above from each of the defendants, jointly and severally, together with interest

2   thereon;

3        F.    Determining and awarding to Oclaro exemplary damages in an amount necessary to

4   punish defendants and to make an example of defendants to the community according to proof at

5   trial;

6        G.    Awarding plaintiff the costs and disbursements of this action, including reasonable

7   attorneys' and experts' fees, costs and expenses; and

8        H.    Granting such other and further equitable relief as this Court may deem just and

9   proper.

10

11  DATED:  July 26, 2011           **FINKELSTEIN THOMPSON LLP**

12

13

14  _____
    Mark Punzalan

15

16  100 Bush Street, Suite 1450
    San Francisco, CA 94104
    Telephone: (415) 398-8700

17  Facsimile: (415) 398-8704

18  **FINKELSTEIN THOMPSON LLP**
    Richard M. Volin

19  The Duvall Foundry
    1050 30th Street, N.W.

20  Washington, DC 20007
    Tel: (202) 337-8000 or

21  Fax: (202) 337-8090 (fax)

22
    *Attorneys for Plaintiff*

23

24

25

26

27

28

- 29 -

SHAREHOLDER DERIVATIVE COMPLAINT